UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) 1:11-cr-00054-JAW |
| | ) |
| JOSEPH SMITH, | ) |
| | ) |
| Defendant | ) |

**RECOMMENDED DECISION ON MOTION TO SUPPRESS**
**(DOC. NO. 15)**

Joseph Smith has moved to suppress all evidence seized during the execution of a state court search warrant in September 2010. Smith claims that the affidavit submitted in support of the search warrant application contains deliberately false information and/or omits material information in a misleading fashion. Smith requests that this court hold an evidentiary hearing to determine whether there are material omissions and false statements by law enforcement personnel within the four corners of the affidavit under Franks v. Delaware, 438 U.S. 154, 155-156 (1978). Based on the parties' written submissions and the arguments presented at oral argument, I find that the defendant has not made the "substantial preliminary showing" necessary in order to convene an evidentiary hearing, id., and therefore recommend that the court deny the motion to suppress in the absence of a hearing.

### The Search Warrant Affidavit

Brian Ross, a Special Agent working for the Maine Drug Enforcement Agency, obtained a search warrant from a State of Maine District Court Judge on September 6, 2010, in order to search a remote camp located along a woods road in Township 6, Maine (north of Weld). The camp is described as being owned by Joseph Smith, a sixty-three year old, long-time resident of the area. Ross's search warrant affidavit consists of seventeen paragraphs of "historical"

information about Smith and his son, Tad Smith.  Beginning in 1992, drug agents in the area received information from a series of confidential informants that Joseph Smith and his son annually cultivated a large number of marijuana plants at remote wooded locations in the vicinity of their residences.  In 1993 Joseph Smith's residence was searched pursuant to a warrant and certain marijuana products were seized.  In November of that year Smith pled guilty to furnishing scheduled drugs in Franklin County Superior Court.  According to confidential sources, Smith's arrest and probationary sentence did not slow down the marijuana cultivation of the Smiths, father or son.

Through calendar year 2009 various law enforcement personnel continued to receive sporadic reports that Joseph Smith remained involved in the commercial cultivation of marijuana.  Incidents involving reports of Joseph or Tad Smith's ongoing involvement in the sale of substantial quantities of marijuana arose in 1994 (concerned citizen report of "common knowledge"); 1996 (post-arrest interview of drug dealer identifies Tad and Joseph as his source of supply); June 1999 (another concerned citizen reports father, son, and two others to be growing over 2,000 plants annually in remote wooded locations after starting the plants in a camp owned by Joseph); July 1999 (agents find and eradicate more than 800 marijuana plants which concerned citizen says were only a part of Smith's plantings); September 1999 (arrested drug dealer tells officers that the Smiths have 100 or more pounds of marijuana buried in cans in the woods off the Number Six Road); October 1999 (confidential informant tells agents he has observed seedlings being cultivated by Tad Smith); October-December 1999 (three controlled purchases made from Tad Smith); January 2000 (search warrant at apartment house owned by Tad Smith, arrested tenant identifies the growing equipment in apartment as belonging to Joseph Smith); December 2000 (a fifth confidential source of information tells agents that Joseph Smith

is still growing marijuana in the vicinity of the Number Six Road); and in June 2007 (a sixth confidential source of information, not facing criminal charges, but angry with the Smiths, reports that Joseph Smith takes guns in trade for marijuana and that he has seen a short barrel shotgun at Smith's house).

In August 2010, a seventh confidential source of information had a meeting with the affiant. This person, an admitted marijuana user, informed the affiant that Tad and Joseph Smith have grown marijuana in the vicinity of the Number Six Road for years and have been able to do so successfully because they have created restricted access by putting gates across the road and also digging out the road. This informant also reported that the father and son bury the marijuana underground and that Joseph and Tad use heavy equipment when digging up the marijuana stored in large containers in the ground. A Maine Forest Ranger told the affiant he had been investigating Joseph Smith for allegedly digging up a logging road that allows access to a woods road beyond the Number Six Road. The affiant investigated Tad Smith's camp and found a well-worn path leading from the camp to a plot of marijuana plants. The forest ranger then told the affiant that he had also found several marijuana plants growing not far from Joseph Smith's camp when he was there investigating the damage to the logging road. The affiant and a state trooper then went to Joseph Smith's camp and observed the roadway, which appeared to have a trench dug across it. The affiant described the magnitude of the trenching as being an extreme measure to prevent access to the area.

On September 1, 2010, the affiant and a deputy sheriff parked at the spot where the trench was dug. Using a map provided by the forest ranger, the affiant found the area where the plants were growing. The affiant observed that these plants were growing in the same manner as Tad Smith's plants, with car fresheners placed at the base of the marijuana stalk, perhaps in a

3

signature protective measure designed to discourage insect pests. In any event, the affiant had observed the car fresheners inside the Tad Smith camp. The affiant observed very well-defined ATV tracks to the start of the beaten foot path that led to the marijuana plants. The driveway that accesses Joseph Smith's camp is the same driveway as the one to which the affiant had followed the ATV tracks. The affiant observed that there was less than a mile between Joseph Smith's camp and the marijuana grow located in the woods by the ranger.

On September 6, 2010, the affiant drove to the road leading to Joseph Smith's camp. He found a large, heavy metal gate secured by a padlock blocking access to the road leading to Smith's driveway. After surveying the area and considering how to execute a search warrant of the camp and curtilage, the affiant made application for a nighttime search warrant in the interest of officer safety, given the remote location of the camp and the likelihood that there could be a cache of firearms and ammunition on the premises. The warrant was signed by a judge at 2:11 p.m. on September 6, 2011, and executed sometime thereafter.

**Smith's Preliminary Showing**

Smith does not dispute that the affidavit as submitted to the state court judge was based on probable cause. His contention is that the representations about the intentional restriction of access to the marijuana grow area and an "ATV trail" from the grow area to Smith's camp were either deliberately false statements or were recklessly implied by omission of facts necessary to the probable cause finding, particularly due to the mile distance between the camp and the grow location. (Reply Mem. at 5, Doc. No. 24, Page ID # 107.) In support of this contention, Smith has submitted his own affidavit in opposition to the search warrant affidavit. (Smith Aff., Doc. No. 15-3.)

4

Smith's first assertion is that Ross's statements contain material omissions about the metal gate that would have established that the gate has no role in restricting access to the marijuana grow which is over one mile into the woods from the remote camp location. First, Smith asserts that the gate was an old cattle gate, not a heavy metal gate as described in the affidavit. Second, he asserts that there were numerous ways to access the marijuana grow other than by the gated road and he attaches a diagram to show how others could have accessed the grow area without passing along the road. He claims that the omission of these other routes of access is the most misleading fact in the affidavit. (Id. ¶ 4.) He also notes that Agent Ross did not include the fact that Eugene Caton, a logger in the area, maintains a blue gate very close to Smith's gate which is equally as much of a barricade as Smith's gate in terms of reaching the marijuana grow.

Next Smith argues that the ditches across the Number Six Road likewise did not impede access to the grow area. Smith also claims that he did not dig the ditches, but rather they were the result of natural erosion and failure to maintain the road. (Id. ¶ 5.) According to Smith, if Ross and/or Rousseau had even done rudimentary investigation, they would have realized that Smith did not dig any trenches across the road.

Finally, Smith says that Ross's assertion about the ATV trail from the marijuana grow to his camp is false, although many ATV trails exist in the area heading in many directions. According to Smith, it is common knowledge in the area that there are numerous ways in and out of this area by ATV without availing oneself of the Number Six Road. (Id. ¶ 4.)

**Legal Standard**

To overcome the presumption of validity of the search warrant affidavit and obtain a Franks hearing, Smith must first make a showing that Ross included deliberate falsehoods or

5

omissions in his search warrant affidavit or recklessly disregarded the truth when he prepared the affidavit. "The defendant 'must make a substantial preliminary showing that the affidavit included a false statement which was made either knowingly or intentionally or with reckless disregard for the truth, and that this misstatement was necessary to the finding of probable cause.'" United States v. Materas, 483 F.3d 27, 31 (1st Cir. 2007) (quoting United States v. Nelson-Rodriguez, 319 F.3d 12, 34 (1st Cir. 2003)). "A material omission in the affidavit may also qualify for a Franks hearing in place of a false direct statement, provided the same requisite showing is made." Nelson-Rodriguez, 319 F.3d at 34. When the defendant complains of a material omission, he must demonstrate that the omission was necessary to the finding of probable cause, *i.e.*, that inclusion of the omission would have negated the judicial officer's finding of probable cause. United States v. Castillo, 287 F.3d 21, 25 n.4 (1st Cir. 2002).

In addition to showing (1) the existence of a false statement or misleading omission and (2) the materiality (as in necessity) of the challenged representation or omission to the probable cause finding, the Franks standard also requires a showing of (3) a basis for inferring the existence of scienter, or culpable state of mind, on the part of the affiant or another officer[1] on whom the affiant relied. Franks, 438 U.S. at 171-72; see also United States v. D'Andrea, __F.3d ___, Nos. 08-2455, 09-1018, 2011 WL 1760207, *9, 2011 U.S. App. Lexis 9541, *31-32 (1st Cir. May 10, 2011) (observing that the truthfulness of a government agent might be examined under Franks when that agent supplies the affiant with materially false information); United

---

[1] Smith spends a great deal of his time attacking Rousseau's credibility and suggesting that the material omissions regarding the "lay of the land" arose because of Rousseau's deliberate omissions of material facts. There is no question but that if Smith had made a substantial preliminary showing, including the material nature of these omissions, he would be entitled to a Franks hearing. The Franks hearing cannot be used to test the truthfulness of a tipster or informant, but it could apply to deliberate misstatements by government actors other than the affiant, according to the D'Andrea opinion, cited above. Smith's showing regarding Rousseau, at best, is that Rousseau's investigation had not been as thorough as Smith would have liked and that Rousseau omitted certain geographic facts (the blue Caton gate and the supposedly numerous ATV trails) that were not material omissions for purposes of the probable cause determination.

6

States v. Maynard, 615 F.3d 544, 551 (D.C. Cir. 2010) (observing that when defendant fails to produce probative evidence of affiant's *scienter,* trial court should not speculate about what the officer may have known); United States v. Skinner, 972 F.2d 171, 177 (7th Cir. 1992) ("The defendant must offer direct evidence of the affiant's state of mind or inferential evidence that the affiant had obvious reasons for omitting facts in order to prove deliberate falsehood or reckless disregard.") (internal quotation marks omitted); United States v. Post, 607 F.2d 847, 849 n.2 (9th Cir. 1979) (noting that "scienter and materiality" are required); U.S. v. Castillo, No. CR-05-81-P-H, 2006 WL 217983, *3, 2006 U.S. Dist. Lexis 3288, *7 (D. Me. Jan. 26, 2006) (Cohen, Mag. J., Mot. for Reconsideration) (flagging the need for "state of mind" evidence and citing Skinner, *supra*).

## Discussion

Smith's theory has two components. First he complains that Ross (perhaps abetted by the forest ranger) deliberately omitted key facts about the existence of other ATV trails in the area and the nature of the obstructions (gates and trench) to the Number Six Road. The fact that Rousseau, as a forest ranger familiar with the area, should have known that there were numerous other ATV trails in the area that might have been used to access this marijuana grow site, does not show that Ross made a material omission that would have negated the finding of probable cause. Assuming that Rousseau knew about the other trails and did not convey that information to Ross—because there is absolutely no suggestion that Ross himself knowingly or with reckless disregard for the truth omitted that fact—it is simply not a material omission that negates probable cause. The issuing judicial officer would have known from the affidavit that the affiant was talking about a remote woods location that was accessed for logging purposes and apparently for growing marijuana. It would surprise no one familiar with the Maine woods to

learn that there were old woods roads or ATV trails running through the woods and thus providing a possible means, other than by the Number Six Road, to access a field of marijuana growing in the middle of nowhere. Smith makes no showing that there were others in the area who had been the subject of police investigation for cultivating marijuana for over fifteen years and who had a camp less than a mile from the grow site, nor that any of these numerous other trails led directly to the beaten footpath or to the marijuana grow site. I therefore conclude that, even if Ross had included the fact that it was possible for someone on an ATV or on foot to circumvent the obstacles placed in the roadway, it would not have negated the probable cause supporting the issuance of the warrant. None of the numerous ATV trails or woods roads identified by Smith in his diagram are shown as leading directly toward the alleged marijuana grow site, so the fact that an ATV could take someone to within a few miles of the grow site, or give them access to the Number Six Road, would not negate probable cause. Nor can this court infer Ross's (or Rousseau's) state of mind regarding this omission without probative evidence that he had actual knowledge regarding the existence of these supposedly numerous trails that led to the general area.

The second series of claimed deliberate omissions pertains to the alleged obstructions to the Number Six Road allegedly installed by Smith. First, the omission of the Eugene Caton gate is irrelevant. According to Smith's own exhibit, Caton's blue gate was across a spur road off the Number Six Road that headed in the general direction of Weld, Maine. (Smith's hand-drawn map, Smith Aff. Ex. 1, Doc. No. 15-3.) The Eugene Caton gate did not block access to the Number Six Road and omitting it from the affidavit, assuming one or both officers even knew about it, had no effect on the probable cause finding. One thing that Smith's hand-drawn map makes clear is that the primary way to access the marijuana site would be from the Number Six

Road where it turns off of Route 4. Even though the Number Six Road belongs to a paper company, Smith admits he constructed a locked gate to block access from Route 4.

The claimed "omission" involving the trenches is apparently related to Rousseau's independent investigation into the cause of the trenching, due to a complaint from the paper company. Unlike the gate, the trenching dispute relates to a "back access way." (Search Warr. Aff. ¶ 25; see also Smith's hand-drawn map.) A confidential source told Ross that Smith had dug trenches in the road to discourage access near where he was growing marijuana. (Search Warr. Aff. ¶ 19.) Smith says in his affidavit he never dug any trenches and the trench was the result of spring runoff and natural erosion. Perhaps further investigation would prove that Smith is correct, but Rousseau's failure to complete his investigation does not negate the fact that Ross saw a huge trench directly in front of a logging road bridge crossing a brook and both his confidential source and Rousseau had informed him they had reason to believe Smith was the architect of the trench. Nothing submitted by Smith casts any doubt upon certain essential facts alleged in the affidavit. Rousseau was there as a result of complaints by the paper company and he was in the midst of his investigation regarding the story behind the trench. Ross talked to a confidential source with personal knowledge of the marijuana operation who told him about the trench. That Ross leapt to a logical, but perhaps erroneous conclusion regarding the genesis of the trench does not negate probable cause and it certainly does not present a substantial showing of a deliberate falsehood or reckless disregard of the truth.

Finally, I come to the crucial allegation in Smith's affidavit. He says that Ross lied about an ATV "trail" leading directly from the marijuana grow site to the driveway of Smith's camp.[2]

---

[2] At oral argument, Smith argued that Ross's affidavit suggested the existence of a "straight arrow" or "breadcrumb" ATV trail that does not actually exist. I do not read the affidavit in this fashion. In any event, although such evidence would certainly generate probable cause, lesser evidence concerning ATV tracks could

However, a careful reading of the competing affidavits is not favorable to Smith. Ross affirmed the following:

> 27. On 09/01/2010, Franklin County Sergeant Steven Lowell and I parked at the spot where JOSEPH SMITH allegedly dug out the road. We followed the map provided to me by Forest Ranger Rousseau. We found the area that the plants were growing in. . . . I observed that there were very well defined ATV <u>tracks</u> leading <u>to the start of the beaten trail</u> that led to the marijuana plants.
>
> . . .
>
> 29. I entered the GPS coordinates of the marijuana grow that Forest Ranger Rousseau found . . . and the GPS coordinates taken by Tpr. Casavant from the air of JOSEPH's camp . . . and found that this distance is less than one mile. While typically a mile might seem to be a long distance to associate marijuana plants with a residence, in this case there is a very clearly defined and well traveled ATV trail that leads down a (sic) <u>old gravel logging road</u> from JOSEPH's camp to the marijuana plants. The tracks that Tpr. Casavant and I followed are the same tracks that I observed driving <u>to the beginning of the foot path</u> that leads to the marijuana plants. Also, since the SMITHS have restricted access to this remote area, it is unlikely that anyone else is able to pass the closed, locked gates or travel over the trenches dug in the road by the SMITHS.

Search Warr. Aff., ¶¶ 27, 29 (Doc. No. 15-2) (emphasis added).

In comparison, Smith's claim of a substantial preliminary showing consists of the following assertion in his affidavit:

> 6. In Agent Ross's affidavit, he suggests that there was an ATV-type trail leading from the marijuana grow in some way to my camp. This is not true, although the area is covered with ATV trails in many directions.

Smith Aff. ¶ 6 (Doc. No. 15-3).

The issue is whether this swearing contest between Ross and Smith is a substantial preliminary showing that Ross deliberately or with reckless disregard of the truth made a false statement that was material to the determination of probable cause. I conclude that this showing falls short of the substantial showing required to justify a <u>Franks</u> hearing. In paragraph 27 of his affidavit, Ross indicated that there was a footpath ("beaten trail") that left the gravel logging

---

easily establish probable cause, too, especially when the other representations in the affidavit are factored into the analysis. Arguably, the ATV tracks are not even necessary to the probable cause finding.

road. He also stated that the ATV tracks ran from the driveway down the logging road to the start of the footpath. This description does not generate an impression that there is a separate and distinct ATV trail running from Smith's camp all the way to the grow location, which is the impression that Smith is trying to undermine in his affidavit. In paragraph 29 of Ross's affidavit, Ross did write that "there is a very clearly defined and well traveled ATV trail that leads down [an] old gravel logging road from JOSEPH's camp to the marijuana plants," but he had previously indicated in paragraph 27 that there was a footpath from the road to the plants and he also repeated that he was describing the "same tracks" previously described as running on the logging road. Ross's description, in other words, does not represent that an ATV trail ran from the grow location to the camp. He clearly indicated that the ATV tracks ran on the logging road from the driveway of the camp to the footpath leading into the location of the plants. Search warrant affidavits are to be read in a common sense manner and hypertechnical readings are to be avoided. United States v. Barnes, 492 F.3d 33, 37-38 (1st Cir. 2007). Smith's argument attempts to force an inference that is contradicted by a complete reading of the affidavit. When paragraphs 27 and 29 are read together, Ross's description of the road and footpath essentially agrees with Smith's map.

In sum, Smith's affidavit testimony does not raise an inference that Ross's search warrant affidavit was drawn with reckless disregard for the truth, let alone contained known and intentional falsehoods. Moreover, the qualifications that Smith seeks to introduce fail to negate the multiple bases for a probable cause finding. These include the Smiths' marijuana cultivation history, the statements from the confidential source concerning the Smith's reputed cultivation activities in areas off the Number Six Road and the Small Road and their efforts to restrict access to the area, the evidence associated with Tad Smith's camp and another nearby plot of marijuana,

the use of the car deodorizers, the apparent effort to prevent use of the bridge on the old logging road, which would provide a back access to the grow location down the way from Joseph Smith's camp, the gate placed at the head of the Number Six Road, and the presence of ATV tracks along the logging road that ran from the driveway of Joseph Smith's camp to the head of the footpath leading to a marijuana plot. Given this assortment of evidence, the affidavit demonstrated a "fair probability" of contraband being found in all of the Smiths' premises in the remote area of the Number Six Road and the Small Road and the assertions in Joseph Smith's affidavit simply fail to negate the basis for including his camp as one of the premises that could be searched pursuant to a warrant. Barnes, 492 F.3d at 36.

## Conclusion

Based upon the foregoing I find that Smith has not made a substantial preliminary showing that would warrant convening a Franks hearing and I recommend that the Court deny the motion to suppress.

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within fourteen (14) days of being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

July 27, 2011